AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| STEVEN CARRILLO | ) | Case No.  4:20-mj-70785-MAG |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____May 29, 2020_____ in the county of _____Alameda_____ in the _____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1114(1), 1114(3) Maximum Penalties: Ct. 1 - life imprisonment or death; $250,000 fine; $100 S.A.; restitution; Ct. 2 - 20 years' imprisonment; 3 years' supervised release; $250,000 fine; $100 S.A.; restitution | Count One: Murder of a person assisting an officer or employee of the United States Government

Count Two: Attempted murder of a person assisting an officer or employee of the United States Government |

This criminal complaint is based on these facts:

Please see attached affidavit of FBI Special Agent Brett Woolard.

☑ Continued on the attached sheet.

```
                                   FILED

                                 Jun 16 2020

                              SUSAN Y. SOONG
                        CLERK, U.S. DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
                                  OAKLAND
```

*/s/ Brett Woolard*
*Complainant's signature*

Approved as to form *David L Anderson*
U.S. Attorney David L. Anderson

Brett Woolard, Special Agent, FBI
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date:   June 15, 2020

*Kandis Westmore*
*Judge's signature*

City and state:   Oakland, California

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Brett Woolard, Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

## OVERVIEW AND AGENT BACKGROUND

1.      I make this affidavit in support of a two-count Criminal Complaint against STEVEN CARRILLO (hereafter CARRILLO):

a.  <u>Count One</u>: Murder of a person assisting an officer or employee of the United States Government in the performance of official duties, in violation of 18 U.S.C. § 1114(1); and

b.  <u>Count Two</u>: Attempted murder of a person assisting an officer or employee of the United States Government in the performance of official duties, in violation of 18 U.S.C. § 1114(3).

For the reasons set forth below, I believe there is probable cause to believe that CARRILLO has committed each of the foregoing violations of federal law.

2.      The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit summarizes such information in order to show that there is probable cause to believe that CARRILLO has committed the violations listed above. This affidavit does not purport to set forth all of my knowledge about this matter, or to name all of the persons who participated in these crimes.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2019. Currently, I am assigned to the Violent Crimes and Major Offender Squad in the Oakland Resident Agency, San Francisco Field Office. As a Special Agent with the FBI, my duties and responsibilities include conducting criminal investigations for

possible violations of federal law, including those found in Title 21 and Title 18 of the United States Code.

4.      I am a graduate of the FBI Academy in Quantico, Virginia. As part of my training to become a Special Agent, I received approximately 20 weeks of instruction at the FBI Academy. During my time at the Academy, I received instruction in investigative processes, evidence collection, interview and interrogation methods, and legal processes associated with federal law enforcement. Since graduating from the Academy, I have conducted and participated in investigations of firearms-related offenses, drug offenses, and fugitive apprehension. During these investigations, I have utilized or participated in various types of investigative techniques, including electronic surveillance pursuant to court-authorized wiretaps, controlled purchases of narcotics from suspects, physical surveillance, investigative interviews, GPS tracking devices, and pole-mounted cameras. I have participated in the execution of federal arrest and search warrants.

**APPLICABLE LAW**

5.      Title 18, United States Code, Section 1114 provides, in relevant part: "Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished—(1) in the case of murder, as provided under section 1111 . . . or (3) in the case of attempted murder . . . as provided in section 1113."

6.      Title 18, United States Code, Section 1111(a) provides: "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed

in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree."

## PROBABLE CAUSE

7.      On the night of May 29, 2020, Steven CARRILLO and Robert Alvin Justus, Jr. ("Justus") carried out a premeditated attack at the federal courthouse in Oakland, California. While Justus drove, CARRILLO opened fire on two guards with an assault rifle from inside a van. One guard died from his wounds. The other guard was seriously wounded. Eight days later, on June 6, 2020, CARRILLO murdered a Santa Cruz County Sheriff's Deputy during an encounter in Ben Lomond, California. Following a confrontation with law enforcement officers and a subsequent carjacking, CARRILLO was arrested in possession of the assault rifle that he had used to murder the courthouse guard. On June 11, 2020, Justus was arrested by the FBI.

### A.  Murder and Attempted Murder of Federal Courthouse Guards on May 29, 2020

8.      At approximately 9:44 PM on May 29, 2020, a passenger inside of a white van opened fire and shot two Protective Security Officers (PSOs) at the Ronald V. Dellums Federal Building and United States Courthouse in Oakland, California ("the Federal Courthouse"). One of the PSOs (Victim 1) died of his gunshot wounds; the other (Victim 2) sustained serious injuries that required surgery. The PSOs were working in an official capacity for Triple Canopy Inc., which is contracted with the Federal Protective Service to provide security at the Federal Building and Federal Courthouse. The Federal Courthouse is located at 1301 Clay Street, which is in the Northern District of California. More specifically, the shooting occurred at a small

3

security guard outpost ("the Guard Post") at the corner of 12th Street and Jefferson Street. The Guard Post is on federal property, adjacent to a driveway leading into the Federal Courthouse. The duties of the PSOs assigned to the Guard Post include controlling access of vehicles driving into the Federal Courthouse's garage and staffing the Guard Post.

9.     Officers of the Oakland Police Department (OPD) responded to the scene almost immediately after the shooting. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) tested shell casings collected from the scene and determined that all casings tested were fired from the same gun.

10.     FBI Special Agents and other personnel also responded to the scene and began investigating the homicide. FBI personnel obtained video from the Federal Courthouse's exterior surveillance cameras. The video showed a white Ford Econoline-style van (hereafter "the Subject Van"), parked on Jefferson Street at the southeast corner of 12th and Jefferson, in the parking spot closest to the intersection, directly across the street from and facing the Guard Post, for approximately fifteen (15) minutes immediately preceding the homicide.

11.     The Subject Van parked at 9:27 PM.[1] The Subject Van stayed in the parking space from 9:27 PM until about 9:44 PM, with its headlights off. At approximately 9:28 PM, a man ("the driver") exited the front driver's side door of the Subject Van and walked around the area until approximately 9:38 PM, when the same man returned and re-entered the Subject Van through the front driver's side door.

12.     I reviewed security video captured in the vicinity of the Federal Courthouse which shows the driver walking away from the van across the street from the Federal Courthouse and

_____

[1] Note that all times in this affidavit are approximate; if the time on the surveillance cameras differed from the actual time, agents have attempted to correct it to the actual time, but there may still be some discrepancy.

disappearing from view. Below is a still image captured from surveillance camera footage that I reviewed, showing the driver of the Subject Van.



13.     At approximately 9:43 PM, the exterior lights of the Subject Van turned on, the van began to move forward toward the Guard Post at the intersection at 12th and Jefferson, the passenger-side sliding door opened, and a second person in the passenger compartment fired multiple rounds from a firearm at the Guard Post.

14.     The below still image depicts the Subject Van in the intersection, with its passenger-side sliding door open, during the shooting. I reviewed the surveillance video and observed a person sitting in the passenger compartment of the Subject Van, visible through the open sliding door. Based on my review of the surveillance footage and scene, I believe the Guard Post received gunfire from that person (sitting in the passenger compartment) from inside the moving Subject Van, which was driven by a different person. Since the Subject Van was moving at the time of the shooting, and made a successful escape from the area around the Federal Courthouse, there were at least two people in the Subject Van at the time of the homicide.



15.     Below are still images captured from surveillance video that I have reviewed; the first image was captured before the shooting, and the second image was captured during the shooting. The images depict the Subject Van, as well as the Guard Post; both locations are circled in red in the first of the two still images.



6



16.      Investigators have reviewed footage of the white Subject Van used in the

homicide and have taken note of various features of the Subject Van. The Subject Van has one

front driver's-side window and, in addition to a window on the front passenger's side, the

passenger's sliding door also had its own window. The rear tailgate area of the Subject Van had

two doors, each with a window. The area where the license plate would normally be placed is

offset to the right rear side of the van; however, the van did not have a license plate affixed at the

time of the homicide. The handle on the passenger door appeared to be bent outward. Below is

an image of the Subject Van captured on a surveillance camera in downtown Oakland. It shows

that the front passenger-side wheel does not appear to have a hubcap, while the rear passenger-

side wheel does have one.



17.     Various surveillance images of the Subject Van showed that both of the Subject Van's headlights, both taillights, and both reverse lights were functioning on May 29, 2020.

18.     Investigators contacted California Department of Motor Vehicles (DMV) investigative personnel, as well as investigative personnel from Ford Motor Company Global Investigations, to try to narrow down a model year of the Subject Van. The DMV and Ford investigators reviewed the Oakland surveillance photos and looked at features such as the grille, the wheels, the bumpers, and the side view mirrors of the Subject Van. Without looking at the actual van, investigators could not state with certainty the model year. A representative of Ford Motor Company Global Investigations stated that based on the grille's appearance, the van looked to be pre-2003 model year and possibly between model years 1997 and 2002. He also stated that the Subject Van might have "Econoline" printed on the back side of the van; if that was the case, the vehicle would be pre-2001, as the Econoline name was dropped in 2001.

19.     Video surveillance shows that the Subject Van was driving in the area of the Federal Courthouse or parked in the area of the Federal Courthouse from at least approximately 9:15 PM to approximately 9:44 PM, when the homicide occurred.

20.     At approximately 9:19 PM on May 29, Federal Protective Service officers observed a white van driving by on Clay Street; video corroborated that the Subject Van was driving past 1301 Clay Street at that time.

21.     In summary, the evidence collected from the area surrounding the Federal Courthouse regarding the events of May 29, 2020, shows that the Subject Van parked in a space with an unimpeded view of the Guard Post at approximately 9:27 PM. A man emerged from the driver's seat and walked around the area for approximately ten minutes, suggesting that he was conducting reconnaissance. The man then returned to the Subject Van and remained in the Subject Van for approximately five minutes before the homicide. Together, I believe these facts suggest that the individuals in the Subject Van were waiting for an opportune time to commit the homicide.

**B.  Murder of a Santa Cruz County Sheriff's Deputy in Ben Lomond on June 6, 2020**

22.     At approximately 1:26 PM on June 6, 2020, in Ben Lomond, California, a witness located a white Ford van that appeared to be abandoned on property controlled by Big Basin Water Company on Jamison Creek Road. The witness observed items in the van that appeared to be ammunition, firearms, and bomb-making equipment. The witness also took note of the white van's Vehicle Identification Number (VIN). The witness reported this information to law enforcement. The VIN, when run by law enforcement, came back as registered to M. L. Carrillo at 120 Waldeberg Road in Ben Lomond, California. Law enforcement also learned that the license plate number assigned to the vehicle was 4P05520, but the abandoned van did not bear any license plates.

23.     Based on subsequent examination of the van that was found abandoned at the property on Jamison Creek Road and for the reasons described below, I believe that the van

found abandoned by the witness on June 6, 2020, is the Subject Van involved in the Federal

Courthouse murder on May 29, 2020. The van found abandoned near Jamison Creek Road is a

white 1992 Ford Econoline E-150 van (hereinafter referred to as "the 1992 van"). The 1992 van

is the same color and shape as the Subject Van. It has the same rear light positions, the same type

of roof, the same type of window latches, and the same bent handle on the sliding passenger

door. The headlights and taillights of the 1992 van were all functional.

24.     Another similarity involves the front passenger-side wheel. As earlier noted, in

surveillance video of the Subject Van in Oakland, the front passenger-side wheel appeared not to

have a hubcap attached. The 1992 van's front passenger-side wheel had a hubcap inconsistent

with the other three wheels. It appears as if a different hubcap was placed on the front passenger-

side wheel in an attempt to conceal the missing original hubcap. This suggests that someone

replaced the front passenger-side hubcap in an attempt to alter the 1992 van's appearance so that

it would not be recognized as the Subject Van.

25.     Another attempt to alter the 1992 van's appearance involved the rear passenger-

side window. While the 1992 van has the same window configuration as the Subject Van

involved in the Oakland homicide, including a window on the sliding passenger-side door, the

window on the sliding passenger-side door of the 1992 van was painted over with white spray

paint. An FBI agent later observed a can of white spray paint inside the 1992 van. According to a

preliminary report, a latent fingerprint belonging to CARRILLO was found on the white spray

paint can.

26.     Below are two photographs of the 1992 van. The windows of the 1992 van were

broken by law enforcement as part of the process of rendering the van safe, due to the possibility

that the 1992 van contained live explosive material, as reported by the person who found the van.



27.    In response to the information provided by the witness at Jamison Creek Road

regarding the 1992 van, deputies from the Santa Cruz County Sheriff's Office (SCSO) responded

to 120 Waldeberg Road at approximately 2:00 PM on June 6, 2020. A sheriff's deputy reported

that she saw a white Ford van similar to the 1992 van traveling up Harmony Hill toward

Waldeberg Road and that the van subsequently parked at 120 Waldeberg Road. Law

enforcement later learned, when someone examined that van and ran its VIN, that this was a

second white Ford van, this one a 1997 model registered to CARRILLO at 120 Waldeberg Road

in Ben Lomond (hereinafter, "the 1997 van"). The 1997 white Ford van does not closely

resemble the van used in the Federal Courthouse murder.

28.    Deputies from the SCSO approached the property at 120 Waldeberg Road.

Someone on the property then opened fire on the deputies. Two members of law enforcement

were shot, with one deputy subsequently dying from his injuries. An explosion also occurred on

the property, injuring one of the officers who had already been shot. The shooter fled the property at 120 Waldeberg Road.

29.     At approximately 2:34 PM, a man used a small assault rifle to carjack a white Toyota Camry from a victim who was driving on Harmony Hill. The carjacker was described by the victim as a Hispanic male, between 5'7" and 5'8" tall, wearing a dark-colored hoodie, with light brown skin and light brown hair, and as between 20 and 30 years old. The carjacker was also described as having blood on his right hip. The Toyota Camry was later located on Alba Road in Santa Cruz County, and an SCSO deputy reported that he observed a person running away from the Camry.

30.     At approximately 3:00 PM, an SCSO deputy advised dispatch that a man wearing a long-sleeved blue shirt was running toward Highway 9. This individual attempted to carjack at least one additional car on Highway 9 in Ben Lomond by using an assault rifle. At 3:35 PM, the same individual was observed at a different location on Highway 9. A witness described the individual as 5'6", in his 20s, with a light build, and as wearing a blue shirt. At 3:39 PM, that individual was taken into custody. The individual was identified as CARRILLO, and a deputy identified him as the same person that he saw running away from the Toyota Camry on Alba Road. A rifle was recovered from the area where CARRILLO was arrested. CARRILLO had a gunshot wound and blood on his hip at the time of his arrest. According to DMV records, CARRILLO is 5'3" tall, weighs 140 pounds, and is 32 years old.

31.     Law enforcement obtained the below photograph from a surveillance camera at a business near where CARRILLO was arrested. It shows CARRILLO holding what appears to be an assault rifle and wearing a dark-colored, long-sleeved shirt and khaki pants.



32.     Law enforcement recovered an AR-15-style rifle from the area where CARRILLO was arrested. An examination of the rifle by ATF revealed that it appears to be a Privately Made Firearm (PMF) with no manufacturer's markings. The firearm is a short-barreled rifle with an overall length of approximately 23-1/8 inches. The weapon is 9x19mm caliber and accepts Glock-type magazines. A function test showed firing on the pull and release of the trigger. A test fire proved that this weapon fired two or three round bursts when the trigger was released and is classified as a machinegun. Finally, the rifle was fitted with a silencer that suppresses the sound of gunfire. Below is a photograph of the rifle.



33.     After CARRILLO's arrest, state law enforcement personnel obtained state search warrants for the property at 120 Waldeberg Road and the 1997 van, as well as for the 1992 van. When the property at 120 Waldeberg Road was searched, officers located 9mm shell casings. At least one of the 9mm shell casings had a headstamp showing it to be "X-Treme" brand. This is the same brand of ammunition as some of the shell casings recovered in the Oakland murder.

34.     ATF examiners have conducted examinations of several ammunition casings collected after the May 29, 2020, Oakland murder and several ammunition casings collected after the June 6, 2020, Ben Lomond murder. The examiners concluded that four of the casings from the Oakland murder were fired from the same gun that fired two of the casings collected from 120 Waldeberg Road. In other words, the same firearm was used in both shootings. ATF examiners have also conducted a ballistic analysis of the rifle recovered from the area of CARRILLO's arrest. The examiners determined through ballistic analysis that this weapon fired casings that were recovered from the Oakland crime scene, as well as casings that were recovered from the Ben Lomond crime scene. Based on this analysis and the other facts described in the affidavit, I believe that CARRILLO used this firearm in both shootings.

**C. Evidence from Ben Lomond Links CARRILLO to the "Boogaloo" Movement**

35.     When law enforcement personnel searched the 1997 van, they also located a ballistic vest. The vest had a patch on it, which is shown in the photograph below. I am informed that the symbols on the patch, including an igloo and a Hawaiian-style print, are associated with the "Boogaloo" movement.



36.     CARRILLO appears to have used his own blood to write various phrases on the hood of the Toyota Camry that he carjacked. Based on my review of the photograph, I recognize the following words and phrases: "BOOG," "I became unreasonable," and "stop the duopoly." A photograph of the Camry's hood is below.



37.     Based on my experience and information I have learned in the course of this investigation, I believe that "Boogaloo" is a term used by extremists to reference a violent uprising or impending civil war in the United States. I am aware that the Boogaloo movement is not a defined group, and I believe that, in general, followers of the Boogaloo ideology may

identify as militia and share a narrative of inciting a violent uprising against perceived

government tyranny.

### D. CARRILLO's Mobile Phone Records Show his Movement on the Night of the Murder

38.     At the time of the murders in Oakland and Ben Lomond, CARRILLO was an

active-duty member of the United States Air Force with the rank of sergeant (E-5). He was

assigned to Travis Air Force Base in Fairfield, California.

39.     On June 9, 2020, an Inspector from the Santa Cruz County District Attorney's

Office sought and obtained a state search warrant for records related to CARRILLO's T-Mobile

account. Following T-Mobile's production of those records pursuant to the search warrant, the

Inspector shared those records with the FBI. CARRILLO's T-Mobile phone records were

analyzed by the FBI's Cellular Analysis Survey Team (CAST). The CAST analysis showed that

on May 29, 2020 – the day of the Oakland murder – CARRILLO's phone was powered on and

was communicating with cell towers starting at Travis Air Force Base from 5:00 PM to 5:37 PM,

when it left Travis Air Force Base. The phone showed communication with towers along I-80

through Berkeley into San Leandro. At 8:09 PM, the phone either powered off or was placed into

airplane mode, because it did not communicate with any towers from 8:09 PM until 10:08 PM

(as earlier noted, the Oakland murder occurred at about 9:44 PM). When CARRILLO's phone

began communicating with cell towers again, it was on I-580 near the Oakland Zoo.

40.     According to the CAST analysis, CARRILLO's phone traveled southbound on I-

880, then to northbound state route 101. It appeared to stop in a residential area of Millbrae,

California. It stayed in Millbrae from about 11:14 PM to 6:22 AM the next day, May 30, when it

made its way to Santa Cruz County. Based on this data, as well as the other evidence obtained in

this case, I believe that CARRILLO traveled from Travis Air Force Base to San Leandro on May

29, 2020. At some point, I believe CARRILLO powered off his phone or put it into airplane mode in order to avoid detection during the time that he committed the assault on the PSOs in Oakland before driving away. I further believe that CARRILLO traveled south from Oakland and then up the peninsula in order to avoid crossing one of the bridges spanning the San Francisco bay, where images of his van would likely have been captured by a bridge surveillance camera. I then believe CARRILLO stayed the night at a location near Millbrae.

41.     CAST agents identified a specific T-Mobile number as the last number in contact with CARRILLO's phone before it was turned off or placed in airplane mode on the night of the homicide. CAST agents used a commercially-available database to identify a possible subscriber to that phone number. According to this database, one possible subscriber was Justus. According to DMV records, Justus is a white male adult, 30 years old, who is 6 feet tall and weighs 165 pounds. This height and weight is consistent with the physical appearance of the driver of the Subject Van from the night of the Oakland homicide.

### E.  Justus Admits to Driving CARRILLO's White Van During the Murder

42.     Upon learning about the connection between CARRILLO and Justus, FBI agents began surveillance of Justus' residence in Millbrae. They observed a man consistent in appearance with Justus' general physical description coming and going from the residence.

43.     The first surveillance team saw Justus smoking cigarettes approximately four times during the six-hour surveillance. Agents assigned to review surveillance video from the night of the Oakland murder, which included footage of the Subject Van driver walking around on foot, observed that the driver of the white van was seen smoking cigarettes.

44.     On the morning of June 11, 2020, surveillance agents observed Justus and his parents drive to the Federal Building located at 450 Golden Gate Avenue in San Francisco.

17

Justus and his parents approached the Federal Building's Visitor Entrance and informed courthouse security officers that they wanted to visit the FBI. An FBI agent approached Justus and his parents, identified herself as an agent, and indicated that she had learned that they wanted to visit the FBI. Justus' mother said that they wanted to provide the FBI with information about the white van in Oakland. FBI agents observed Justus nodding in agreement with his mother's statement. An FBI agent then walked with the family into the Federal Building. Once the family was through security, FBI agents took Justus and his parents to an FBI conference room. At approximately 11:00 am, Justus began a consensual interview with FBI agents.

45.     Justus stated that he met CARRILLO on Facebook, and the two arranged to meet on May 29 for CARRILLO to give Justus a ride to protests that were taking place in Oakland. Justus and CARRILLO met at the San Leandro BART station, where CARRILLO arrived in a white van. Justus further stated that he later removed the license plate of the white van at CARRILLO's direction.

46.     According to Justus, when Justus originally got in the van, CARRILLO offered him body armor and a firearm, but Justus declined to use them. Justus stated that he briefly handled the firearm but then dropped it on the seat. Justus stated that, at that point, CARRILLO instructed Justus to drive the van; Justus said that he drove the van the entire time that he was with CARRILLO. Justus drove away from the San Leandro BART station at CARRILLO's direction. The two then drove around Oakland for a time, which Justus said was to look for parking. Justus said that the reason he got out of the white van was to walk around and see what was going on.

47.     Justus said he did not want to participate in the murder, but that he felt that he had to participate because he was trapped in the van with CARRILLO. An interviewing agent

pointed out to Justus that he had gotten out of the van and walked around alone before the murder took place, and he conceivably could have left at any time. Justus responded that he stayed with CARRILLO because Justus was trying to think of ways to talk CARRILLO out of his plan. Justus said CARRILLO expressed an interest multiple times in shooting a helicopter, police officers, and civilians, but that Justus talked him out of it. They eventually parked near the Guard Post. As Justus drove the white van away from the Guard Post, CARRILLO opened the passenger-side sliding door and began shooting. As they drove away, CARRILLO said words to the effect of "did you see how they fucking fell." Justus described CARRILLO being excited and thrilled after the shooting.

48.     After the murder, Justus drove himself and CARRILLO to a nearby location and Justus put the license plate back onto the van at CARRILLO's direction. He and CARRILLO then drove to Millbrae, and CARRILLO dropped off Justus. CARRILLO told Justus not to talk about what happened that night and not to brag about what happened.

49.     Justus said that, after CARRILLO left, Justus destroyed evidence of his involvement in the murder. Specifically, Justus stated that he got rid of the clothing that he wore, and he erased from his phone any communication with CARRILLO. He also claimed to have disposed of the backpack that he was seen carrying in some of the video surveillance.

50.     Based on my training, experience, and review of the evidence in this case, I do not believe Justus did not want to participate in the murder as he claimed during his statement to FBI agents. I reviewed surveillance video in this case, which shows Justus walking on foot through downtown Oakland prior to the murder. He could have walked away from the van and not returned, or he could have reported CARRILLO and his plans to a nearby law enforcement officer. Justus did not come forward to report his involvement with CARRILLO in the Oakland

murder until after the murder of the SCSO deputy and arrest of CARRILLO. I therefore believe

Justus' statement to the FBI was a false exculpatory narrative carefully crafted to fit what Justus

believed to be the state of the evidence.

### F. Facebook Records Show CARRILLO and Justus Communicated in Advance of the Murder

51.     The FBI has obtained, via search warrant, records from some of CARRILLO's

Facebook accounts. I have reviewed a Facebook exchange between CARRILLO, Justus, and

another individual that occurred on May 28, 2020, at approximately 7:20 AM.[2] At that time,

CARRILLO posted in a Facebook group, "It's on our coast now, this needs to be nationwide. It's

a great opportunity to target the specialty soup bois. Keep that energy going." This statement was

followed by two fire emojis and a link to a YouTube video showing a large crowd violently

attacking two California Highway Patrol vehicles. At approximately 7:37 AM, Justus responded,

"Lets boogie." Another user commented at approximately 6:44 PM, "Starting tomorrow,

Oakland be popping off. Maybe more." Based on my research, I believe that "soup bois" may be

a term that followers of the Boogaloo movement use to refer to federal law enforcement agents; I

know that federal law enforcement agencies are sometimes referred colloquially to as "alphabet

soup" agencies. I believe that Justus' response "let's boogie" is a statement of agreement and

affirmation to engage in attacks on law enforcement personnel in accordance with Boogaloo

ideology. Accordingly, I believe that these messages show that, on May 28, 2020, the day before

the attack on the FPS officers, CARRILLO, Justus, and others were discussing a plan to travel to

Oakland and attack federal law enforcement officers.

---

[2] All times referencing Facebook posts have been converted from Universal Time Code (UTC) to
Pacific Daylight Time (PDT).

52.     On May 29, 2020, at 7:57 AM, CARRILLO commented on Facebook, "If it kicks off? Its kicking off now and if its not kicking off in your hood then start it. Show them the targets." At 8:02 AM, CARRILLO commented on Facebook, "She was stabbing people. And no. Go to the riots and support our own cause. Show them the real targets. Use their anger to fuel our fire. Think outside the box. We have mobs of angry people to use to our advantage."

53.     On the night of May 29, 2020, at the time of the murder and attempted murder of the Federal Courthouse guards, there were large crowds and demonstrations occurring in downtown Oakland in the area of the Federal Courthouse.

## **CONCLUSION**

54.     Based on the above information, I submit that there is probable cause to believe that on or about May 29, 2020, in the Northern District of California, STEVEN CARRILLO committed the following federal offenses:

a.      Count One: Murder of a person assisting an officer or employee of the United States Government in the performance of official duties, in violation of 18 U.S.C. § 1114(1); and

b.      Count Two: Attempted murder of a person assisting an officer or employee of the United States Government in the performance of official duties, in violation of 18 U.S.C. § 1114(3).

///

///

///

55.     I respectfully request that the Court sign the requested criminal complaint and

issue the requested arrest warrant for CARRILLO.

I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

_/s/ Brett Woolard_ _____
Brett Woolard
Special Agent
Federal Bureau of Investigation


Sworn to before me over the telephone and signed by me this 15th day of June 2020.

_____
THE HONORABLE KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE